## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

CONSUMER FINANCIAL PROTECTION
BUREAU, and UNITED STATES OF
AMERICA,

      Plaintiffs,

        Civil Action No.

        **COMPLAINT AND JURY DEMAND**

      v.

FAIRWAY INDEPENDENT MORTGAGE
CORPORATION,

      Defendant.

## COMPLAINT

## INTRODUCTION

1.     The Consumer Financial Protection Bureau (Bureau) and the United States of

America (the United States) bring this action against Fairway Independent Mortgage Corporation

(Fairway) under the Fair Housing Act (FHA), 42 U.S.C. §§ 3601-3619, the Equal Credit

Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f, ECOA's implementing regulation

(Regulation B), 12 C.F.R. part 1002, and the Consumer Financial Protection Act of 2010

(CFPA), 12 U.S.C. § 5536(a)(1)(A), to remedy discrimination in Fairway's mortgage lending.

2.     The FHA and ECOA prohibit creditors, such as non-depository mortgage

companies, from discriminating in mortgage lending on the basis of race, color, and other

prohibited bases. The FHA and its implementing regulations make it unlawful to discriminate

against any person in making available residential real estate-related credit transactions, in

making available or denying a dwelling, or in the terms, conditions, or privileges of sale of a dwelling or the provision of services in connection with such a sale, on the basis of race, color, and other characteristics. 42 U.S.C. §§ 3604(a)-(b), 3605(a); 24 C.F.R. §§ 100.110(b), 100.120. ECOA and Regulation B make it unlawful for a creditor to discriminate against an applicant in any aspect of a credit transaction on the basis of race, color, or other prohibited bases. ECOA and Regulation B also prohibit any statements, acts, or practices that would discourage on a prohibited basis an applicant or prospective applicant from making or pursuing an application for credit. 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(b); 12 C.F.R. § 1002.4, Supp. I, ¶ 4(b)(1).

3.      From at least 2018 through 2022, Fairway engaged in a pattern or practice of unlawful discrimination against applicants and prospective applicants on the basis of race and color, including by redlining majority-Black areas in the Birmingham-Hoover, AL Metropolitan Statistical Area (Birmingham MSA) and engaging in acts and practices directed at applicants and prospective applicants that would discourage, on a prohibited basis, a reasonable person from making or pursuing an application for credit. For the purposes of this Complaint, "Black" refers to people who identified as Black or African American and "white" refers to people who identified as non-Hispanic and white.

4.      The acts and practices alleged in this Complaint occurred from at least 2018 through 2022, unless otherwise noted.

5.      "Redlining" is one type of discrimination prohibited under the FHA, ECOA, and Regulation B. Redlining occurs when lenders discourage credit applications, deny equal access to home loans and other credit services in certain areas, or avoid providing home loans and other

credit services based on, for example, the race, national origin, or color of the residents of those areas.

6.      Fairway engaged in a pattern or practice of unlawful redlining and discouragement on a prohibited basis. Fairway's redlining practices included locating and maintaining all of its physical retail locations and loan officers in majority-white areas and failing to locate any physical locations and loan officers in—or train, instruct, or incentivize its loan officers to effectively serve—majority-Black areas in the Birmingham MSA.

7.      Fairway predominantly directed its marketing and advertising to majority-white areas from 2018 through 2022, while failing to conduct effective marketing and advertising to majority-Black areas in the Birmingham MSA until at least late 2022.

8.      Fairway's primary method of marketing and generating mortgage loan applications in the Birmingham MSA was through its loan officers' relationships, including in their local communities. However, all of Fairway's loan officers held themselves out as working out of offices located in majority-white areas and predominantly served these areas in generating mortgage loan applications. Further, Fairway's loan officers largely failed to serve majority-Black areas and Fairway failed to effectively train or incentivize its existing loan officers to better serve majority-Black areas.

9.      Through these acts or practices, Fairway discriminated against, including by discouraging, applicants and prospective applicants on a prohibited basis, and as a result generated disproportionately low numbers of loan applications and mortgage loans from majority-Black areas in the Birmingham MSA compared to similarly situated lenders.

10.     Fairway's conduct and practices were intended to deny, and had the effect of denying, equal access to mortgage loans for those residing in, or seeking credit for properties

3

located in, majority-Black areas, and otherwise discouraged applicants and prospective applicants from making or pursuing applications for mortgage loans on the basis of the race or color of the residents of those areas. Fairway's conduct was not justified by a legitimate, non-discriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, non-discriminatory interest.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action because it is brought under federal laws, 12 U.S.C. § 5565(a)(1), 15 U.S.C. § 1691e(h), 42 U.S.C. § 3614(a), presents a federal question, 28 U.S.C. § 1331, and is brought by the United States and an agency of the United States, 28 U.S.C. § 1345.

12.     Venue is proper in this District under 28 U.S.C. § 1391 and 12 U.S.C. § 5564(f), because Fairway conducts business in, and a substantial part of the events or omissions giving rise to the claims occurred in, this judicial district.

## PARTIES

13.     The Bureau is an independent agency of the United States created by the CFPA. 12 U.S.C. § 5491(a). The Bureau has independent litigating authority, including the authority to enforce the CFPA and ECOA. 12 U.S.C. §§ 5481(12)(D), (14), 5564(a)-(b).

14.     The United States brings this action to enforce the FHA and ECOA. The FHA and ECOA authorize the Attorney General to bring a civil action in federal district court whenever he has reason to believe that an entity is engaged in a pattern or practice of resistance to the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to bring suit where the defendant has denied rights to a group of persons and that denial raises an issue of general public importance.

42 U.S.C. § 3614(a). ECOA also authorizes the Attorney General to bring civil enforcement actions against creditors who have "engaged in a pattern or practice of discouraging or denying applications for credit" after referral from a responsible enforcement agency, such as the CFPB. 15 U.S.C. § 1691e(g)-(h).

15.     The Bureau made a referral to the Department of Justice pursuant to ECOA, 15 U.S.C. § 1691e(g).

16.     Fairway was incorporated in Texas in 1996 and is headquartered in Madison, Wisconsin.

17.     Fairway is a non-depository mortgage company that receives applications and originates mortgage loans throughout the United States, including in Birmingham, Alabama.

18.     Nationwide, Fairway generated the ninth most mortgage loan applications and originated the fifth most mortgage loans of all lenders based on 2022 HMDA data.

19.     For purposes of this Complaint, the term "mortgage loans" refers to loans that Fairway and other creditors must report under the Home Mortgage Disclosure Act (HMDA), 12 U.S.C. §§ 2801-2810, and "mortgage lending" refers to providing these loans.

20.     Fairway acquired a mortgage company, MortgageBanc, in the Birmingham MSA in 2009 and installed MortgageBanc's prior leadership to oversee and operate its new location in the Birmingham MSA.

21.     Since 2009, Fairway has operated in the Birmingham MSA under the trade name—and prior company name—MortgageBanc.

22.     Fairway has maintained key MortgageBanc leadership to oversee its operations in the Birmingham MSA since 2009.

23.     Fairway's leadership in the Birmingham MSA made decisions about hiring, marketing, branch location(s), and business strategy for Fairway in the Birmingham MSA.

24.     Fairway has been a top-five lender by application volume in the Birmingham MSA.

25.     Fairway is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. part 100 and 12 C.F.R. part 1002.

26.     Fairway is a "creditor" under ECOA, 15 U.S.C. § 1691a(e), and engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

27.     Fairway is a "covered person" under the CFPA. 12 U.S.C. § 5481(6)(A), (15)(A)(i).

## FACTUAL ALLEGATIONS

28.     Fairway acted to meet the credit needs of majority-white areas while failing to serve the credit needs of majority-Black and high-Black areas in the Birmingham MSA. Fairway's statements, acts, and practices directed at applicants and prospective applicants were discriminatory, including by discouraging applications for credit for properties located in majority-Black and high-Black areas in the Birmingham MSA.

29.     A "majority-Black" area comprises one or more census tracts in which more than 50% of the residents reported their race to the U.S. Census Bureau as Black or African American. A "high-Black" area comprises one or more census tracts in which more than 80% of the residents reported their race to the U.S. Census Bureau as Black or African American. A "majority-minority" area comprises one or more census tracts in which over 50% of the residents identified as Hispanic or as any race other than white, and includes majority-Black and high-Black areas. A "majority-white" area comprises census tracts in which more than 50% of the

residents reported their race and ethnicity to the U.S. Census Bureau as white and not Hispanic. Unless otherwise specified, all demographic data discussed in this Complaint is based on 2015 through 2019 American Community Survey five-year estimate data from the U.S. Census Bureau, except that with respect to analysis of 2022 HMDA data, demographic data is based on 2020 Census data.

30.    The Birmingham MSA was comprised of six counties: Bibb, Blount, Chilton, Jefferson, Shelby, and St. Clair.

31.    As of 2019, the population of the Birmingham MSA was 1,085,330, of which 62% were white people, 30% were Black people, 5% were Hispanic people, and 3% were of another race or ethnicity.

32.    The Birmingham MSA comprised 245 populated census tracts, of which 81 (33%) were majority-Black.[1]

33.    Forty-five (18%) of the Birmingham MSA census tracts were high-Black as well as majority-Black.

34.    The population of the 81 majority-Black census tracts in the Birmingham MSA was 79% Black people, 15% Hispanic people, 4% white people, and 2% people of another race or ethnicity.

35.    All of the majority-Black and high-Black areas or census tracts were located in Jefferson County, which was home to over 60% of the Birmingham MSA population.

---

[1] According to 2020 Census data for the Birmingham MSA, the population was 1,115,289, of which 59% were white people, 29% were Black people, 6% were Hispanic people, and 6% were of another race or ethnicity. Also based on 2020 Census data, there were 304 populated census tracts in the Birmingham MSA, of which 89 were majority-Black (29%) and 50 were high-Black (16%).

36.     Jefferson County's population was 659,680, of which 50% were white people, 43% were Black people, 4% were Hispanic people, and 3% were of another race or ethnicity.

37.     The other counties in the Birmingham MSA were all at least 75% white.

**Fairway Received Disproportionately Low Numbers of Mortgage Loan Applications from Majority-Black and High-Black Areas**

38.     Fairway claims to serve the entire Birmingham MSA.

39.     However, Fairway's lending demonstrated a pattern or practice of underserving and avoiding providing lending services in those areas of the MSA that are majority-Black and high-Black.

40.     Fairway's acts and practices alleged herein—including the concentration of its retail and loan production offices, loan officers, marketing, and advertising in majority-white areas—have discriminated against, including by discouraging, applicants and prospective applicants seeking credit secured by properties in majority-Black and high-Black areas in the Birmingham MSA from applying for and obtaining mortgage loans and other mortgage related services.

41.     Publicly available data collected by the United States Census Bureau and Fairway's own data on loan applications, which it is required to report under HMDA, confirms that from 2018 through 2022, Fairway disproportionately failed to serve majority-Black and high-Black areas in the Birmingham MSA.

42.     From 2018 through 2022, Fairway significantly underperformed as compared to similarly situated "peer" lenders in generating applications from majority-Black and high-Black areas as a percentage of the applications it generated in all areas in the Birmingham MSA.

43.     The disparity between the rate of applications generated by Fairway and the rate generated by its peer lenders from majority-Black and high-Black areas was both statistically

significant—meaning unlikely to be caused by chance—and sizeable in every year from 2018 through 2022.

44.     Specifically, of the 10,247 HMDA-reportable mortgage applications that Fairway generated from 2018 through 2022 in the Birmingham MSA, only 3.7% were applications for properties in majority-Black areas. By contrast, Fairway's peers generated 12.2% of their 70,712 applications from these same majority-Black areas. These disparities are statistically significant across the five-year period and in every year analyzed.

45.     In other words, from 2018 through 2022, Fairway's peer lenders generated applications for properties in majority-Black areas at over three times the rate of Fairway.

46.     The disparity was even greater in high-Black areas for the same period. While only 0.5% of Fairway's applications were for properties in high-Black areas, 4.5% of the peers' applications were for properties in the same high-Black areas. These disparities are statistically significant across the five-year period and in every year analyzed.

47.     In other words, from 2018 through 2022, Fairway's peer lenders generated applications for properties in high-Black areas at over eight times the rate of Fairway.

48.     Fairway also underperformed its peer lenders in generating applications from majority-minority areas as a percentage of the applications it generated in all areas in the Birmingham MSA, resulting in statistically significant disparities between the rate of applications generated by Fairway and the rate generated by its peer lenders in these areas in every year from 2018 through 2022.

49.     Even when Fairway generated applications for properties in majority-Black areas in the Birmingham MSA, the applicants themselves were less likely to be Black, based on HMDA data. In majority-Black areas, on average, only 41.4% of Fairway's applications came

from applicants identified as Black. By contrast, when Fairway's peers generated applications from majority-Black areas, on average, 76.7% of their applications came from applicants identified as Black. These disparities are statistically significant.

50.     The statistically significant disparities between applications Fairway generated for properties in majority-Black and high-Black areas, and those that its peers generated, show that there were significant numbers of applicants seeking mortgage loans secured by properties in majority-Black and high-Black areas in Birmingham. Fairway had no legitimate, non-discriminatory reason to draw so few applications from these areas.

51.     This data shows a statistically significant failure by Fairway to generate applications for mortgage loans from, and provide residential mortgage services to residents in, majority-Black and high-Black areas on a non-discriminatory basis when compared with similarly situated lenders from 2018 through 2022. See Exhibits A and B, which show from where Fairway drew mortgage loan applications in the Birmingham MSA.

**Fairway Made Disproportionately Low Numbers of Mortgage Loans in Majority-Black and High-Black Areas**

52.     From 2018 through 2022, in addition to its underperformance in generating mortgage loan applications in majority-Black areas, Fairway significantly underperformed its peer lenders in *making* mortgage loans in majority-Black areas in the Birmingham MSA.

53.     The disparity between the rate of mortgage loans that Fairway made and the rate its peer lenders made in majority-Black and high-Black areas was both statistically significant—meaning unlikely to be caused by chance—and sizeable in every year from 2018 through 2022.

54.     Specifically, of the 7,913 HMDA-reportable loans that Fairway made from 2018 through 2022 in the Birmingham MSA, only 3.3% were for properties in majority-Black areas. By contrast, Fairway's peers made 10.1% of their 43,371 loans for properties in these same

majority-Black areas. These disparities are statistically significant across the five-year period and in every year analyzed.

55.     In other words, from 2018 through 2022, Fairway's peer lenders made loans in majority-Black areas at more than three times the rate of Fairway.

56.     The disparity was even greater in high-Black areas for the same period. While only 0.4% of Fairway's loans were for properties in high-Black areas, 3.3% of the peers' loans were for properties in the same high-Black areas. These disparities are statistically significant across the five-year period and in every year analyzed.

57.     In other words, from 2018 through 2022, Fairway's peer lenders made loans in high-Black areas at more than eight times the rate of Fairway.

58.     Fairway also underperformed its peer lenders in making mortgage loans in majority-minority areas as a percentage of the mortgage loans it made in all areas in the Birmingham MSA, resulting in statistically significant disparities between the rate that Fairway made mortgage loans in these areas and the rate that Fairway's peer lenders made mortgage loans in these areas in every year from 2018 through 2022.

59.     Even when Fairway made loans in majority-Black areas in the Birmingham MSA, the borrowers themselves were less likely to be Black, based on HMDA data. In majority-Black areas, on average, 37.8% of Fairway's loans were made to applicants identified as Black. By contrast, when Fairway's peers made loans in majority-Black areas, on average, 74.2% of the loans were to borrowers identified as Black. These disparities are statistically significant.

60.     The statistically significant disparities between mortgage loans Fairway made in majority-Black and high-Black areas, and those that its peers made, show that there were significant numbers of qualified applicants seeking loans secured by properties in majority-Black

and high-Black areas of Birmingham. Fairway had no legitimate, non-discriminatory reason to originate so few loans from these areas.

61.    This data shows a statistically significant failure by Fairway to make mortgage loans and provide residential mortgage services to borrowers with loans secured by properties in majority-Black and high-Black areas on a non-discriminatory basis when compared with similarly situated lenders from 2018 through 2022. See Exhibits C and D, which show where Fairway originated mortgage loans in the Birmingham MSA.

**Fairway Concentrated All of Its Retail Loan Offices in Majority-White Areas**

62.    Fairway's retail loan offices were located to serve the credit needs of residents in majority-white areas and avoid serving the credit needs of residents of majority-Black and high-Black areas in the Birmingham MSA.

63.    Within the time period of 2015 through 2022, Fairway operated three retail loan offices and three loan production desks located in real estate offices in the Birmingham MSA, all of which were in majority-white areas. See Exhibit E.

64.    Fairway's leadership in the Birmingham MSA decided where to locate Fairway's Birmingham MSA retail loan offices.

65.    Fairway has not maintained a retail loan office in Jefferson County, where all of the Birmingham MSA's majority-Black and high-Black census tracts are located, since 2016.

66.    In 2016, Fairway moved its primary office, where most of its loan officers worked, from a majority-white area in southern Jefferson County to a majority-white area in Shelby County that was less than 12% Black.

67.     From 2018 through 2022, Fairway maintained signs advertising its presence outside of its physical retail locations in the Birmingham MSA, none of which were in majority-Black areas.

68.     Fairway's websites and 2018-2020 advertising materials also identified its retail office locations in the Birmingham MSA, and one website prominently displayed a map identifying its primary office location in a majority-white area.

69.     Fairway failed to take actions that effectively compensated for its lack of retail locations in majority-Black and high-Black areas in the Birmingham MSA.

70.     As of October 2022, Fairway's leadership in the Birmingham MSA had not taken any actions specifically directed at increasing applications in majority-minority areas in the Birmingham MSA, which include majority-Black and high-Black areas.

71.     By locating all of its retail locations in majority-white areas in Shelby County, advertising those locations, and failing to take actions to effectively compensate for its physical locations, Fairway discouraged residents of majority-Black areas and high-Black areas in Jefferson County from applying for and obtaining mortgage loans from Fairway and restricted their access to credit in the Birmingham MSA.

**Fairway's Loan Officers and their Referral Sources Primarily Served Majority-White Areas and Largely Failed to Serve Majority-Black Areas**

72.     Fairway's loan officers primarily served the credit needs of majority-white areas but largely failed to serve the credit needs of majority-Black areas and high-Black areas in the Birmingham MSA.

73.     In the Birmingham MSA, all of Fairway's loan officers worked or held themselves out as working out of Fairway's retail office locations, all of which were located in majority-white areas.

74.     Most of Fairway's loan officers located in the Birmingham MSA were hired based on their relationships with the Birmingham branch's senior vice president or vice president of business development, both of whom are white.

75.     As of October 2022, Fairway's leadership in the Birmingham MSA lacked a strategy for recruiting new mortgage loan officers, such as hiring new loan officers with experience in serving, or ties to referral sources in, majority-Black areas and high-Black areas in the Birmingham MSA.

76.     Fairway's primary method of marketing and generating mortgage loan applications in the Birmingham MSA was through its loan officers' referral sources of real estate agents and builders, current and former customers, and individuals in their churches, local schools, family, and social organizations.

77.     The vast majority of Fairway's referrals of applicants or prospective applicants came from referral sources located in majority-white areas in the Birmingham MSA; indeed, less than 3% of Fairway's referrals were from referral sources in majority-Black areas, and less than 1% were from high-Black areas, based on Fairway's own referral data.

78.     In the Birmingham MSA, Fairway failed to be effective in generating applications in majority-Black areas and high-Black areas or effectively train or incentivize its existing loan officers to better serve majority-Black and high-Black areas.

79.     And, despite primarily relying on its loan officers' referral sources, Fairway failed to effectively monitor whether these particular referral sources were leading to referrals and applications that excluded majority-Black areas and high-Black areas in the Birmingham MSA.

80.     As a result of Fairway's strategy of relying on its loan officers' referral relationships, the vast majority of all applicants and prospective applicants referred to Fairway

lived in majority-white areas in the Birmingham MSA; in fact, less than 8% lived in majority-Black areas and less than 3% lived in high-Black areas, based on Fairway's own referral data.

81.    Fairway's marketing strategy of relying on its loan officers' referral sources in the Birmingham MSA was ineffective in generating applications in majority-Black areas and high-Black areas in the Birmingham MSA.

**Fairway's Marketing Was Predominantly Directed to Majority-White Areas and Not Directed to Majority-Black Areas and High-Black Areas**

82.    Fairway's marketing in the Birmingham MSA was largely driven by the Birmingham branch's senior vice president and loan officers.

83.    Images of Fairway's loan officers and other employees in the Birmingham MSA were displayed on Fairway's websites, in marketing materials including on social media, and, at times, even in loan officer signature blocks in emails.

84.    These images in Fairway's marketing materials depicted Fairway's employees in the Birmingham MSA, nearly all of whom were white and none of whom were Black.

85.    Fairway identified about 565 digital or print advertisements that it used from 2018 through 2020 in the Birmingham MSA, of which about 200 were used for direct-mail campaigns and the remainder were used for other advertising, such as digital advertising.

86.    About 300 of these advertisements contained an image of a person, such as a loan officer, a real estate agent, or a model, with about 99% containing at least one image of a person who appeared to be white and only about 11% containing an image of a person who appeared to be Black.

87.    Fairway's direct-mail advertising campaigns in the Birmingham MSA resulted in over 20,000 individual direct mailings being sent to identified addresses from 2018-2020 (direct

mailings), of which 15,000 contained an image of a person, such as a loan officer, model, or real estate agent.

88.     Of those over 15,000 direct mailings showing images of a person, only about 150 mailings contained an image of someone who appeared to be other than white (about 1%).

89.     Further, from at least 2018 through at least 2020, Fairway's fair lending policy required review of its marketing for fair lending compliance, including to ensure that "the marketing material's audience includes all consumers and does not exclude consumers" on a prohibited basis.

90.     Despite its policy, Fairway did not require compliance personnel to review the geographic area where its proposed marketing materials were to be distributed.

91.     As a result, of the over 20,000 direct mailings that Fairway sent to an identified address in the Birmingham MSA from 2018 through 2020, less than 3% were sent to a majority-Black area and less than 0.5% were sent to a high-Black area in the Birmingham MSA, even though 33% of census tracts in the Birmingham MSA are majority-Black tracts. See Exhibit F.

92.     In addition to the direct mailings, Fairway specifically directed dozens of other types of marketing to majority-white zip codes, neighborhoods, or areas in the Birmingham MSA, while none of this marketing was directed specifically to majority-Black or high-Black zip codes, neighborhoods, or areas in the Birmingham MSA.

93.     In 2018 and 2019, one of Fairway's largest marketing expenditures in the Birmingham MSA was pursuant to marketing services agreements with two real estate companies, ARC Realty and LIST Birmingham.

94.     These marketing services agreements provided that the real estate companies would display Fairway marketing materials at their listings, in their offices, on their websites, and through direct mailings.

95.     The real estate offices that displayed Fairway marketing materials under these agreements were both located in majority-white areas in the Birmingham MSA.

96.     Additionally, one of the real estate companies provided Fairway with periodic reports identifying the listing addresses where it displayed Fairway's marketing materials. The overwhelming majority of verifiable listing addresses were located in majority-white areas.

97.     Despite receiving information about these listing addresses, Fairway took no action to ensure that either real estate company also displayed Fairway's marketing materials at listing addresses located in majority-Black areas.

98.     From 2018 through 2022 in the Birmingham MSA, Fairway also directed significant marketing and advertising expenditures at the members of a country club, an annual charity event, a fitness center, middle school, and a religious college.

99.     The country club, annual charity event, fitness center, middle school, and religious college were all located in majority-white areas.

100.    Fairway predominantly directed mail and other marketing and advertising to majority-white areas, and also directed almost no advertising specifically at majority-Black areas and high-Black areas.

**Fairway Failed to Improve Lending in Majority-Black Areas**

101.    Fairway's own data showed that it was failing to adequately serve majority-Black and high-Black areas in the Birmingham MSA. Since at least 2017, Fairway has used third-party

17

vendors to assist in reviewing HMDA-reportable data to evaluate its redlining risk in majority-minority areas. Areas identified as majority-minority would include all majority-Black areas.

102.    Since at least 2017, Fairway provided its Board of Directors, Chief Executive Officer, and other members of its Executive Committee with updates on the status of its fair lending monitoring, including the results of Fairway's annual monitoring for redlining risk.

103.    The results of Fairway's annual monitoring for redlining risk should have put Fairway on notice that it was failing to adequately serve majority-Black and high-Black areas in the Birmingham MSA.

104.    For years, Fairway failed to meaningfully address HMDA-reportable data showing that Fairway was underserving majority-minority and majority-Black areas in the Birmingham MSA.

105.    Before September 2022, at the earliest, Fairway failed to take any meaningful actions directed at increasing its applications and originations in majority-Black areas in the Birmingham MSA.

106.    As of October 2022, Fairway's Birmingham branch leadership had still not taken any steps to address redlining risk in the Birmingham MSA, other than telling loan officers not to discriminate.

107.    Despite having knowledge that it was failing to serve majority-minority and majority-Black areas in the Birmingham MSA, Fairway failed to adopt a written plan for marketing or growth to address this concern.

108.    From at least 2018 through 2022, Fairway failed to meaningfully increase the percentage of its applications that it generates, and the loans it makes, in majority-Black and high-Black areas as compared to other lenders based on HMDA data.

109.     The totality of Fairway's acts, policies, and practices described herein constitute unlawful discrimination, including by discouragement and redlining of majority-Black and high-Black areas in the Birmingham MSA.

110.     Fairway engaged in acts or practices that, together and separately, discriminated against applicants and prospective applicants on the basis of the race or color of the residents of majority-Black and high-Black areas in the Birmingham MSA, including by redlining and discouraging them from seeking or obtaining credit from Fairway.

111.     Fairway's discriminatory practices as described herein were intended to deny and discourage, and had the effect of denying and discouraging, equal access to home loans on the basis of race or color.

**Fairway Employees Exchanged Emails Using Derogatory or Discriminatory Language to Refer to Majority-Black Areas and a Black Applicant**

112.     From at least 2018 through 2020, several of Fairway's employees, all of whom were white, sent and received emails via their Fairway email accounts using derogatory language to refer to majority-Black or high-Black areas in the Birmingham MSA, indicating a culture consistent with discrimination, including by discouraging applications for credit for properties in these areas.

113.     In a May 2020 email chain between a top-producing loan officer for Fairway in the Birmingham MSA and a Fairway loan processor, the loan officer wrote in the context of purchasing a property, "Ensley is the GHETTO. We don't own a house there I promise. LOL!" The Fairway processor responded "ROFLOL," presumably meaning "rolling on the floor

laughing out loud." Ensley is a high-Black area in Birmingham from which Fairway drew zero mortgage loan applications from 2018-2021.

114.     In an April 2018 email chain, a Fairway mortgage closer emailed a Fairway loan officer, both of whom worked in the Birmingham MSA, and referred to the "Tarrant ghetto" in the subject line of the email. Tarrant is located in a majority-Black area in Birmingham from which Fairway drew zero mortgage loan applications from 2018-2021.

115.     In a 2018 email chain between two Fairway loan officers, one of the loan officers, who was a top-producing loan officer in the Birmingham MSA, referred to an applicant's friends as "thug friends" and wrote of the applicant, "[w]e don't need him as a client. He is a liability waiting to happen." The loan officer then wrote, "I referred him to a Realtor in [T]russville [. . .] he showed up drunk with 4 of his thug friends and showed [h]is ass." The email exchange does not include an explicit reference to the person's race, but data provided by Fairway shows that the person applied for a loan with Fairway, was identified as African American, and withdrew his application in 2018.

### COUNT I: VIOLATIONS OF THE FAIR HOUSING ACT
#### (By the United States of America)

116.     The United States incorporates all prior paragraphs of the Complaint as if fully set forth herein.

117.     Fairway's policies and practices constitute the unlawful redlining of majority-Black areas and high-Black areas in the Birmingham MSA on account of the race or color of residents in those areas. Fairway's policies and practices were intended to deny, and had the effect of denying, equal access to home loans to residents of majority-Black and high-Black

areas and those seeking credit for properties located in those areas. Fairway's conduct was not justified by business necessity or legitimate business considerations.

118. Fairway's actions alleged herein constitute:

    a. Discrimination on the basis of race or color in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulation, 24 C.F.R. §§ 100.110(b), 100.120;

    b. The making unavailable or denial of dwellings to persons because of race or color in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulation, 24 C.F.R. § 100.50(b)(3); and

    c. Discrimination on the basis of race or color in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulation, 24 C.F.R. §§ 100.50(b)(2), 100.65.

119. Fairway's policies and practices alleged herein constitute, in violation of 42 U.S.C. § 3614(a):

    a. A pattern or practice of resistance to the full enjoyment of rights secured by the FHA; and

    b. A denial of rights granted by the FHA to a group of persons that raises an issue of general importance.

120.    Fairway's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race or color.

121.    Persons who have been victims of Fairway's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i), and may have suffered damages as a result of the Fairway's conduct in violation of the FHA, as described above.

### COUNT II: VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT
### (By the Consumer Financial Protection Bureau and the United States of America)

122.    The Bureau and United States incorporate paragraphs 1-115 of this Complaint as if fully set forth herein.

123.    Fairway's acts, policies, and practices as alleged herein constitute unlawful discrimination against applicants and prospective applicants, including by redlining majority-Black and high-Black areas in the Birmingham MSA and engaging in acts and practices directed at applicants and prospective applicants that would discourage a reasonable person from making or pursuing an application for credit on the basis of race or color in violation of ECOA and Regulation B. 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(a)-(b).

124.    Fairway's policies and practices as alleged herein constitute a pattern or practice of discrimination and resistance to the full enjoyment of rights secured by ECOA, in violation of ECOA. 15 U.S.C. § 1691e(h).

125.    Fairway's pattern or practice of discrimination was intentional and willful and was implemented with reckless disregard for the rights of individuals based on their race or color.

126.     Persons who have been victims of Fairway's discriminatory policies and practices are aggrieved and may have suffered damages as a result of Fairway's conduct in violation of ECOA as described above.

**COUNT III: VIOLATION OF THE CONSUMER FINANCIAL PROTECTION ACT**
**(By the Consumer Financial Protection Bureau)**

127.     The Bureau incorporates paragraphs 1-115 and 122-126 of this Complaint as if fully set forth herein.

128.     Section 1036(a)(1)(A) of the CFPA prohibits a covered person from offering or providing to a consumer any financial product or service not in conformity with "Federal consumer financial law" or otherwise committing any act or omission in violation of a "Federal consumer financial law." 12 U.S.C. § 5536(a)(1)(A).

129.     ECOA is a Federal consumer financial law. 12 U.S.C. § 5481(12)(D), (14).

130.     Fairway's ECOA violations, described above in Count II, constitute violations of section 1036(a)(1)(A) of the CFPA. 12 U.S.C. § 5536(a)(1)(A); 15 U.S.C. § 1691c(b).

**DEMAND FOR RELIEF**

Wherefore, the Bureau and United States request that the Court enter an order that:

(1)     Declares that Fairway's acts and practices violate the FHA. 42 U.S.C. §§ 3601-3619;

(2)     Declares that Fairway's acts and practices violate ECOA. 15 U.S.C. §§ 1691-1691f;

(3)     Declares that Fairway's acts and practices violate the CFPA. 12 U.S.C. § 5536(a)(1)(A);

(4)     Enjoins Fairway, its agents, employees, successors, and all others in active

concert or participation with Fairway, from:

     a.  Discriminating on account of race or color in any aspect of their lending business practices;

     b.  Discouraging applicants or prospective applicants from making or pursuing an application for credit on account of race or color;

     c.  Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of Fairway's unlawful practices to the position they would be in but for the discriminatory conduct; and

     d.  Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Fairway's unlawful practices, and provide policies and procedures to ensure all segments of Fairway's market areas are served without regard to prohibited characteristics;

(5)     Awards damages, restitution, equitable, and other monetary relief, under 42 U.S.C. § 3614(d)(1)(B), 15 U.S.C. §§ 1691c(a)(9) and 1691e(h), and 12 U.S.C. § 5565;

(6)     Assesses a civil penalty against Fairway in an amount authorized by 12 U.S.C. § 5565(c) and 42 U.S.C. § 3614(d)(1)(C); and

(7)     Awards Plaintiffs such additional relief as the interests of justice may require.

## **DEMAND FOR A JURY TRIAL**

The Bureau and United States demand a trial by jury in this action on all issues so triable.

Dated: October 15, 2024              Respectfully submitted,

**FOR THE CONSUMER FINANCIAL PROTECTION BUREAU:**

ERIC HALPERIN
*Enforcement Director*

DEBORAH MORRIS
*Deputy Enforcement Director*

EMILY SACHS
*Assistant Deputy Enforcement Director*

s/Jesse Stewart
Jesse Stewart
NY Bar No. 5145495
Tiffany Hardy
NY Bar No. 4074142
Attorneys for Plaintiff
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Telephone: 202-430-0628
Facsimile: 202-435-5468
Email: Jesse.Stewart@cfpb.gov
Email: Tiffany.Hardy@cfpb.gov

**FOR THE UNITED STATES OF AMERICA:**

|  |  |
|---|---|
|  | MERRICK B. GARLAND<br>Attorney General |
| PRIM F. ESCALONA<br>United States Attorney | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division |
| JASON R. CHEEK<br>Chief, Civil Division | CARRIE PAGNUCCO<br>Chief |
|  | VARDA HUSSAIN<br>Principal Deputy Chief |

/s/ Carla C. Ward

CARLA C. WARD
Carla.Ward@usdoj.gov
New York Bar #4494779
Deputy Chief, Civil Division
U.S. Attorney's Office
Northern District of Alabama
1801 4TH ST., NORTH
Birmingham, AL 35203
(205) 244-2185

/s/ Sara L. Niles

SARA L. NILES
Sara.Niles@usdoj.gov
Massachusetts Bar #634257
TERRENCE K. MANGAN
Terrence.Mangan2@usdoj.gov
Maryland Bar #2006010006
Trial Attorneys
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW – 4CON
Washington, DC 20530
(202) 514-4713